### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00136 (RC)** |
| **v.** | : | |
| | : | |
| **FELIPE MARQUEZ,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Felipe Marquez to four months of incarceration, one year of supervised release, and $500 in restitution.

### I.     Introduction

The defendant, Felipe Marquez, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Marquez pled guilty to one count of 18 U.S.C. § 1752(a)(2), disorderly or disruptive conduct in a restricted building or grounds.  As explained herein, a jail sentence is appropriate in this case because (1) the defendant entered the Capitol building as part of a mob, with alarms blaring and next to broken glass and windows; (2) once inside the Capitol building, he interfered with Capitol Police officers trying to protect the building by repeatedly asking them for selfies and fist bumps; (3) he spent about 10 minutes, with 20 other rioters, inside the private hideaway office

1

of Senator Merkley, which suffered substantial damage, (4) he spent about 53 minutes inside the Capitol itself, and (5) he traveled from Florida to Washington, D.C., with a firearm in his car (though he apparently did not remove it from the car while in Washington, D.C.)

Even if he did not personally engage in violence or property destruction during the riot, he appears to have celebrated the riot.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification, and particularly his entry into the private office of a member of Congress, combined with the defendant's celebration and endorsement of the success of the mob in scaling the Capitol's walls and breaching the Capitol's interior, renders a jail sentence both necessary and appropriate.

## II.     Factual and Procedural Background

### A.  The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 22 (Statement of Offense), at ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### B.  Marquez's Travel to Washington, D.C.

On January 5, 2021, Marquez, alone, in his own car, drove from South Florida to Washington, D.C. Along the way, he used his cell phone to record himself and other cars on the

road headed towards the nation's capital.  In the trunk of his car was a Glock firearm, inside a case.
*See* Exhibit FM-9 (video filmed by Marquez that he posted to YouTube on January 9, 2021, showing, from 9:40 to 10:35 on the counter, the firearm in the trunk of his car in Virginia before Marquez drove into Washington, D.C.).  Marquez later told law enforcement that he left the firearm in the car when he went to the Capitol.

C.  *Marquez's Role in the January 6, 2021 Attack on the Capitol*

Marquez attended President Trump's rally at the Ellipse and then headed to the Capitol. He recorded himself on the west side of the Capitol, on a terrace, as others tried to join him in an effort to breach the building itself.  In a video that Marquez later posted to SnapChat,[1] he yelled, "Yeah baby.  Climb the wall!"  He then panned the camera over the wall to show a man scaling the wall:



---

[1] Shortly after January 6, Marquez posted to SnapChat a four-minute "story" that contained a compilation video of his trip from Florida to Washington, D.C., including his time inside the Capitol.  That video, which is Exhibit FM-6, was screencaptured by a tipster and provided to the government.  The portion of the video with Marquez on the west terrace begins around 3:12 on the counter.

At the same time, Marquez can be heard screaming encouragement at the man and the crowd below.  When the man got to the top of the wall, Marquez yelled, "Let's go!"

Shortly afterwards, at about 2:49 p.m., Marquez, with dozens of other members of the mob, physically entered the Capitol building, through the Senate Wing Door.  The mob had breached this door just seconds earlier.[2]  A line of police officers had been physically keeping the mob back, but at 2:48:41 p.m., the mob overpowered the officers, pushing them backwards:



At the time, Marquez was in the mob just outside the door.  On the video, Marquez first comes into view just 20 seconds later in the door threshold:

[2] Attached as Exhibit 11 is a video surveillance clip from the Capitol Police of the Senate Wing Door from 2:45 p.m. to 2:52 p.m.



At the same time Marquez walked with the mob through the door, rioters were climbing through the windows.

A line of Capitol Police officers had already mustered to prevent the mob from penetrating further into the building.  But Marquez was not deterred.  Within two minutes, he pushed to the front of the crowd, coming within inches of the officers at 2:51 p.m.:



Here, Marquez took the opportunity to try to convince the officers that they were all on the same side and that the officers should be happy with the presence of Marquez and the mob. Obviously, the officers saw the mob (and Marquez) as a threat to their own safety and the safety of the building and the people they were sworn to protect.  But Marquez evidently thought the whole experience was joyful and celebratory.

From this vantage point, just inches from officers, Marquez filmed a video, Exhibit FM-1, in which he joined chants of "U.S.A!" and loudly exclaimed "Woo-hoo!"  This is a screenshot:



As the officers tried to organize themselves, Marquez, as captured on his own recording (Exhibit FM-2), repeatedly asked them for a "fist bump."  He even tapped an officer—who understandably had more important duties to attend to—on the arm to get the officer's attention:



In that same recording, Marquez (seen on the left side of the photograph, wearing a red hat and yellow neck gaiter) then turned the camera around to get a selfie video of himself smiling in front of a mob screaming at the line of Capitol Police officers:



Marquez ended this minute-long video with a big thumbs up to the camera (and a vape pen in his hand, which is discussed further below):



At around 2:58 p.m., Marquez left the foyer area near the Senate Wing Door and, with several other rioters, made his way down a hallway to Senator Merkley's hideaway office. There, Marquez, with at least 20 other rioters in the room, sat at the senator's conference table and used

his cell phone to film the room (as captured in Exhibit FM-3).  Marquez's own cell phone video

captured other rioters smoking and yelling and banging on the table:



Marquez then held his vape pen up to the camera, as if to capture the arrogance of the rioters

(himself included) smoking in a senator's office during an Electoral College certification

proceeding to formally elect the next President of the United States[3]:



---

[3] During his custodial interview, Marquez told the FBI that he did not like that people were smoking in the office where he was sitting, and that is why he was recording them.  He said he asked others, "Why are you smoking?"  But the video itself shows otherwise: he appears to be glorifying the smoking.

Towards the end of the video, with Marquez still filming, another rioter knocked over a lamp:



In the second video that Marquez filmed in Senator Merkley's office (Exhibit FM-4), that same rioter displayed obvious signs of having been pepper sprayed, including red watery eyes:



Indeed, Marquez even commented about how that rioter "got hit with the tear gas." Yet Marquez remained in Senator Merkley's office, jovially taking hits on his vape pen.

At 11:36 p.m. on January 6, Senator Merkley posted a three-minute-long video to Twitter showing the damage that his office incurred during the riot. The video is available on Twitter at

https://twitter.com/SenJeffMerkley/status/1347039504528498688, and a copy is being provided to the Court as Exhibit 10.  Senator Merkley explained that rioters appear to have "smashed the door virtually off its hinges," even though the door was unlocked.  He said that the rioters "left a Trump flag here to mark their presence."  The senator narrated how the rioters "stole the laptop that was sitting on the table," and panned across his conference table—the same table at which Marquez had been sitting several hours earlier—to show the damage and disarray.  He then zoomed in on ashes on a table to discuss how the rioters appear to have been "smoking something" in the office.  In Senator Merkley's words, one can "count this office trashed."

As for Marquez, he left Senator Merkley's office after about 10 minutes.  (The timing is approximate.  Marquez is last seen on surveillance video in the lobby near the Senate Wing Door at 2:58 p.m., and he is next seen on surveillance video in the Capitol's Crypt at 3:08 p.m.)  In the Capitol's Crypt, Marquez filmed himself (Exhibit FM-5) cheering and screaming as rioters roamed about:



Narrating the scene, Marquez said, with lightness in his voice, "We only broke a couple windows." That statement could not be further from the truth.  As Marquez admitted in the Statement of Offense (ECF 22), at ¶ 6, the Capitol sustained more than $1.4 million in damages.  Not only were windows and doors damaged, but the Capitol itself was physically invaded during a critical session of democracy.  To downplay what happened on January 6 is to mislead our citizenry.

After spending about 7 minutes in the Crypt, Marquez made his way back to the Senate Wing Door lobby, at around 3:15 p.m.:



After that, Marquez is not seen on surveillance video for about 25 minutes.[4]  The next time Marquez is visible on surveillance video is at 3:40 p.m., when he is being escorted through and out of the Capitol by two police officers.  By this time, law enforcement officers had mostly cleared

---

[4] Marquez stated in his custodial interview that while inside the Capitol he spent a considerable amount of time in the bathroom.  The government does not have information to confirm or dispute this assertion.

the areas in which Marquez is walking—the Crypt, the House Wing Door, and the Hall of Columns.

At 3:42 p.m., after Marquez spent close to an hour inside the building, police officers escorted him through the Hall of Columns and out of the south door of the Capitol:



Once outside, a photojournalist took a picture of Marquez giving two thumbs to the crowd, reflecting his positive review of the entire experience:



Marquez admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so, and he engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress. ECF 22 (Statement of Offense), at ¶ 11.

### D.  Marquez's Social Media Posts

After the attack on the Capitol, Marquez posted his video compilation "story" on SnapChat. (Exhibit FM-6.)  He was obviously proud of what he had done.

While driving home from Washington, D.C., to Florida on the night of January 6—as indicated by both the posting date and the video title—Marquez filmed himself and then posted that video to YouTube (Exhibit FM-7).  He titled his YouTube video, "My thoughts on the word coon, while driving back from the DC protest":



My Thoughts On The Word Coon, While Driving Back From The DC Protest
50 views • Jan 6, 2021

13

Two days later, on January 8, 2021, while back at home in South Florida, Marquez posted another video to YouTube, this one titled "Wasn't me DC protest remix with Lindsey Graham" (Exhibit FM-8) [5]:



In the video that Marquez posted to his YouTube page, he complained that Senator Graham had called the people who "walked" into the Capitol building "terrorists."  According to Marquez, "We had almost a million people, doing almost no damage."  He claimed, "This was a peaceful protest," not terrorism, and that "we literally didn't hurt anybody."  Marquez then rapped about his experience during the riot, to the tune of Shaggy's "It Wasn't Me."  Some of his lyrics included, "We even fist-bumped police," and "we were taking selfies."  After the rap, Marquez justified his actions, saying, "the quote unquote storming of the building was nothing compared to what founding fathers would have done."

---

[5] The government notes the irony that Marquez is wearing a t-shirt that says, "Property of FBI."

*E.  Marquez's Interview*

Marquez voluntarily agreed to an interview with the FBI at the time of his arrest.  During the interview, Marquez admitted that he was inside the Capitol and generally made the following statements:

- I wanted to show my support
- I think communists are trying to gain influence in the U.S. government
- I went there to protest communism and prostitution
- The only video I recorded from within the building—and I was in the building, I want to be honest—was my black friend who I met at the Capitol.  He was hit by tear gas.
- I was upset by violence
- I was in the bathroom pooping when the violence occurred
- I didn't see any violence at all
- I went through the entrance where people had broken the window
- Once the door was destroyed, I guess the police has opened the door and started letting people in
- Police backed off to let us in
- I tried to fist bump with the officers
- I was really mad at someone tearing down a Mandarin something in the office I was in
- I saw a dude punch a hole in the wall and it pissed me off
- My interactions with the Capitol Police were super friendly.

*F.  The Charges and Plea Agreement*

On January 15, 2021, the government charged Marquez by complaint with violating 18 U.S.C. § 1752(a)(1) and 40 U.S.C. § 5104(e)(2).  On January 19, 2021, the FBI arrested Marquez at his home in Florida. On February 19, 2021, the grand jury returned an indictment charging Marquez with five counts:

(1)  18 U.S.C. § 1512(c)(2) – Obstruction of an Official Proceeding;

(2)  18 U.S.C. § 1752(a)(1) – Entering or Remaining in a Restricted Building or Grounds;

(3)  18 U.S.C. § 1752(a)(2) – Disorderly and Disruptive Conduct in a Restricted Building or Grounds;

(4)  40 U.S.C. § 5104(e)(2)(C) – Entering and Remaining in Certain Rooms in the Capitol

    Building; and

(5)  40 U.S.C. § 5104(e)(2)(D) – Disorderly Conduct in a Capitol Building.

On September 10, 2021, Marquez pled guilty to count three of the indictment, charging

him with a violation of 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted

Building or Grounds.  In exchange, the government agreed to dismiss the remaining counts in the

indictment.  By the plea agreement, Marquez agreed to pay $500 in restitution.

*G.  Marquez's Subsequent Contacts with Law Enforcement*

On January 19, 2021, Southern District of Florida Magistrate Judge Alicia Valle ordered

Marquez to not possess any firearms and to surrender all firearms to U.S. Probation.  Rule 5(c)(3)

Documents From 21-mj-6020-AOV (S.D. Fla.) (ECF 5), at 16; PSR ¶ 7.  On February 10, 2021,

this Court ordered Marquez to not possess any *illegal* firearms, Order Setting Conditions of

Release (ECF 8), at 2, though at that point he should have already relinquished all firearms to U.S.

Probation.  Moreover, on September 13, 2021, at the request of the government, the Court amended

Marquez's release order to explicitly prohibit him from possessing *any* firearms.   ECF 24.

However, during a home inspection on October 26, 2021, Pretrial Services found that

Marquez had signed over all firearms to his roommate.  PSR ¶ 46.  This suggests that Marquez did

not take this Court's order seriously, as (a) he was supposed to have relinquished his firearms in

January upon his arrest and (b) living in a house with a roommate who is in possession of

Marquez's firearms appears to be an end-run around what the government and this Court were

concerned about: Marquez having ready access to firearms.

Moreover, on August 6, 2021—while pending his involvement in this very case—an

officer with the Coral Springs (FL) Police Department stopped Marquez at the Coral Square Mall.

16

According to the police report, mall security called the police for a suspicious person, because Marquez was at the mall with a black plastic firearms case with the word GLOCK written on it. The police officer wrote that when he "encountered the subject [Marquez], subject confirmed that he has a weapon on him and that his CCW (Concealed Carry Weapon) license was suspended. Subject had admitted that carrying a weapon in a public place such as a mall is inappropriate, but he did it as a sign of protest for suspension of his CCW." Marquez then left the mall voluntarily.

### III.   Statutory Penalties

Marquez now faces a sentencing on a single count of 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment; a fine up to $100,000; and a term of supervised release of not more than one year. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). By plea agreement, the parties have agreed that the riot caused approximately $1.4 million of damage to the United States Capitol and the defendant agreed to pay restitution in the amount of $500. That restitution should be paid to the Architect of the Capitol as indicated in the PSR.

### IV.   The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of

individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.[6] According to the PSR, the U.S. Probation Office calculated Marquez's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B2.3(a)) | 4 |
| Specific Offense Characteristic (U.S.S.G. § 2B2.3(b)(1)(A)(vii)) | +2 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 24-33.

The U.S. Probation Office calculated Marquez's criminal history as a category I, which is not disputed. PSR at ¶ 36. Accordingly, the U.S. Probation Office calculated Marquez's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 73. His Guidelines fine range is $500 to $9,500. U.S.S.G. § 5E1.2(c)(3). Marquez's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S.

---

[6] Pursuant to U.S.S.G. §1B1.2 and Appendix A, if more than one Guidelines provision may apply to a particular offense, a court should "use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." Appendix A provides two Guidelines options for a violation of 18 U.S.C. § 1752: U.S.S.G. § 2A2.4 (obstructing or impeding officers) or U.S.S.G. § 2B2.3 (trespass). Because the government agreed in the plea agreement that U.S.S.G. § 2B2.3 is the applicable Guideline here, we do not object to its use in this case. Upon further review of the applicable law and principles, however, the government has concluded that U.S.S.G. § 2A2.4 is the appropriate Guideline for a violation of 18 U.S.C. § 1752(a)(2).

at 349.  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."  *Kimbrough*, 552 U.S. at 108.  Accordingly, courts must give "respectful consideration to the Guidelines."  *Id.* at 101.  As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).  "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one."  *Rita*, 551 U.S. at 347 (emphasis in original).  In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court likely knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subject to Guidelines analysis. In order to reflect the will of Congress—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

Sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a period of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without

20

authorization did so under the most extreme of circumstances. As he entered the Capitol, he would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. He also likely observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to his fair and just punishment. Had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Marquez's SnapChat "story" (Exhibit FM-6) encapsulates his posture on that day—he encouraged and celebrated the riot and then capitalized on it by unlawfully entering the Capitol in its wake. Marquez's posting of the video to SnapChat demonstrates that he wanted to share with others that the police were outnumbered and overcome by the rioters, and that rioters were literally

scaling the walls—with his encouragement—in their efforts to breach the Capitol and obstruct Congress's proceedings.

Marquez entered the building within a minute of the breach at his location of entry, the Senate Wing Door.[7]  While no police officers blocked his path, there were clear signs of violent entry. The window adjacent to the door through which Marquez passed had been smashed out. Marquez walked by a pile of shattered glass on the ground as he moved deeper into the U.S. Capitol. He would have heard the alarm sounding throughout the Capitol: a loud, high-pitched, continuous beeping, similar to a smoke alarm.  Indeed, the alarm is audible on the videos he recorded while in the Senate Wing Door foyer (Exhibits FM-1 and FM-2).  Marquez also should have been aware that tear gas had been deployed—he spent time with another rioter who had obviously been sprayed with pepper spray, as captured on Exhibit FM-4.

Once Marquez had passed the line of riot police, he spent at least several minutes sitting at a conference table in Senator Merkley's office, while other rioters screamed and chanted and smoked.  For his part, Marquez filmed their actions, smoked on his own vape pen, and appears to have reveled in the experience.

Marquez did not express any remorse for his actions—or even recognition of the severity of his actions—in his interviews with either the FBI or the Probation Office.  Indeed, Marquez's YouTube video from January 8 rapping about his positive experience (Exhibit FM-8) demonstrates that he thought his time inside the U.S. Capitol was joyful and celebratory.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

---

[7] The Senate Wing Door was first breached about a half hour prior but was secured shortly afterwards, and it was secured at the time Marquez joined the mob in pushing back officers.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Marquez has no criminal history.  PSR ¶ 36.  He reported to Probation that he is an independent contractor doing IT work and for Amazon Flex.  While the PSR indicated that Marquez was "found not in need of mental health treatment," PSR ¶ 9, the defense has provided the government with a report related to Marquez's mental health, which the government considered as part of its allocution.

Marquez's transportation of a firearm to Washington, D.C.,[8] and then continued possession of a firearm and/or access to a firearm while on release in this case shows that he does not appreciate the severity and dangerousness of his actions.  Walking around a mall with an obvious firearm in a case, while on pretrial release for a felony offense, demonstrates both poor judgment and potential danger to the community.

There is a need for specific deterrence here because Marquez's actions even after arrest do not indicate that he appreciates the severity of his criminal conduct.  He posted a video about the riot at the Capitol with the partial title, "Wasn't me."  (Exhibit FM-8.)  In the video, he said, "This was the most patriotic thing ever."

Outside the Capitol, he flashed a "thumbs up" to a photojournalist.  And inside the Capitol, he was generally gleeful:



---

[8] During his custodial interview, Marquez admitted to driving to Washington, D.C., with his Glock firearm, but says he left the firearm disassembled in a locked case in his car when he was at the Capitol so as to comply with local laws.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[9]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### 1.  General Deterrence

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes

---

[9] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss

during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification. It is a damage that will persist in this country for decades.

Tr. 7/19/21 at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it

was seven months ago for the United States and our diplomats to convince other nations to pursue

democracy. It means that it will be harder for all of us to convince our children and our

grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see*

*United States v. Thomas Gallagher*, 21-CR-41 Tr. 10/13/21 at 37 ("As other judges on this court

have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol,

in a manner that delays the certification of the election, throws our entire system of government

into disarray, and it undermines the stability of our society. Future would-be rioters must be

deterred.") (statement of Judge Nichols at sentencing); *United States v. Matthew Mazzocco*, 21-cr-

54-TSC, Tr. 10/4/21 at 24-25 ("What happened on that day was nothing less than the attempt of a

violent mob to prevent the orderly and peaceful certification of an election as part of the transition

of power from one administration to the next, something that has happened with regularity over

the history of this country. That mob was trying to overthrow the government…. A mob isn't a

mob without the numbers. The people who were committing those violent acts did so because

they had the safety of numbers.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United*

*States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. 7/19/21 at 46 ("I don't think that any plausible

argument can be made defending what happened in the Capitol on January 6th as the exercise of

First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process— that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

### 2.   Specific Deterrence

Marquez's words, post-arrest interview, and statements on social media clearly demonstrate the need for specific deterrence for this defendant.  Marquez celebrated the breach of the Capitol, encouraging others to literally scale the walls.  And he defiled the building, smoking and glorifying the smoking of others.

After the attack, he posted his YouTube video celebrating his participation in the attack. (Exhibit FM-8.)  While he told the Probation Office that he "agreed with" the conduct as described in the statement of offense, PSR ¶ 23, there is no indication that he expressed any remorse.  And given his post-arrest conduct with firearms and posts on YouTube, he does not appear to have grasped the gravity of what he did.

The government acknowledges that Marquez accepted responsibility early by entering into this plea agreement.  On the other hand, his failure to acknowledge the dangers and violence of January 6, 2021 and his lack of remorse underscore the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[10]  Each offender must be sentenced based on his or her individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A probationary sentence should not necessarily become the default.[11]  Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be."  *United States v. Anna Morgan-Lloyd*, 21-cr-164-RCL, Tr. 6/23/21 at 19; *see also United States v. Valerie Ehrke*, 21-cr-97-PFF, Tr. 9/17/21 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that.  Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is relatively low, the government and the sentencing courts have already begun to make meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely

---

[10] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[11] Early in this investigation, the government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 21-cr-00164-RCL; *United States v. Valerie Elaine Ehrke*, 21-cr-00097-PFF; and *United States v. Donna Sue Bissey*, 21-cr-00165-TSC. The government is abiding by its agreements in those cases, but it has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

in terms of their conduct and subsequent punishment.  Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration.  Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

As described above, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators.  In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69-71 (D.C. Cir. 2006).  "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences.").  In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). "A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)." *Id.*

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

Here, the Court is presented with the unique circumstances of a rioter-defendant in a sensitive space, the bombastic rhetoric associated with January 6 approbation, and specific acts of disobedience and horseplay while inside of the Capitol. While no one factor is dispositive, comparable cases demand a sentence of incarceration.

Marquez's case is particularly unique among Capitol breach cases, in that this is the first sentencing to involve rioters inside of Senator Merkley's office. However, other judges of this court have sentenced Capitol breach defendants who spent time in sensitive places within the

Capitol.  In *United States v. Paul Hodgkins*, 21-cr-188-RDM, which the defendant pled guilty to a felony charge of 18 U.S.C. § 1512(c)(2) (obstruction of an official proceeding) in connection with being in the Senate Chamber itself, Judge Moss sentenced the defendant to 8 months of incarceration.  In *United States v. Derek Jancart and Erik Rau*, 21-cr-148-JEB and 21-cr-467-JEB, in which the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's conference room, Judge Boasberg sentenced the defendants each to 45 days of incarceration.  And in *United States v. Matthew Mazzocco*, 21-cr-54-TSC, in which the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building) in connection with spending time inside the Spouse's Lounge of the Capitol, Judge Chutkan also sentenced the defendant to 45 days of incarceration.  Defendants Jancart and Rau spent about 40 minutes inside the Capitol, while Defendant Mazzocco spent only 12 minutes, compared to the 53 minutes for Marquez.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

**VI.     Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors.  As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Felipe Marquez to four months of incarceration, a period of supervised release of one year, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.  Consistent with the plea agreement, the government also asks the Court to dismiss the remaining counts in the indictment.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Jeffrey S. Nestler*
Jeffrey S. Nestler
Assistant United States Attorney
D.C. Bar No. 978296
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530
Phone: 202-252-7277
Email: Jeffrey.Nestler@usdoj.gov

</div>

Exhibit and Attachment List

Videos:
1. Exhibit FM-1 – Cell phone video in entranceway (chanting)
2. Exhibit FM-2 – Cell phone video in entranceway (with officers)
3. Exhibit FM-3 – Cell phone video in Senator Merkley's office (facing outward)
4. Exhibit FM-4 – Cell phone video in Senator Merkley's office (facing inward)
5. Exhibit FM-5 – Cell phone video in Crypt
6. Exhibit FM-6 – SnapChat compilation
7. Exhibit FM-7 – YouTube video: "My thoughts on the word coon, while driving back from DC"
8. Exhibit FM-8 – YouTube video: "Wasn't me DC protest remix with Lindsey Graham"
9. Exhibit FM-9 – YouTube video: "DC Protest Vlog Part 1 'The March' With Tesla Road Trip"
10. Exhibit 10 – Senator Merkley Twitter video
11. Exhibit 11 – U.S. Capitol Police surveillance video, Senate Wing Door, 2:45 pm to 2:52 p.m.

*Note that the 11 videos are contained on a DVD provided to the Court.*

*Note that the government does not object to the public release of any of the above videos.*

Documents:
1. Table of sentencing decisions