**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No.   21-cr-00136 (RC)** |
| **FELIPE MARQUEZ,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**SENTENCING MEMORANDUM**</u>

**Introduction**

On December 10, 2021, Mr. Felipe Marquez, pursuant to a guilty plea, will appear before

this Court to be sentenced for Disorderly or Disruptive Conduct in a Restricted Building or

Grounds, in violation of 18 U.S.C. § 1752(a)(2).  Mr. Marquez respectfully requests, after

considering all the relevant sentencing factors, including 18 U.S.C. § 3553(a), the Court impose

a period of probation, with the additional conditions of $500 in restitution and participation in a

mental health treatment program as determined by the U.S. Probation Office.

**RELEVANT FACTS AND BACKGROUND**

On December 19, 2020, following his loss in the 2020 presidential election, then-

President Donald Trump announced a "Save America" rally to protest the results.[1]  The rally was

set for January 6, 2021, the same date Congress was set to certify Joseph Biden as the winner.

---

[1]      President Trump announced the rally on Twitter, tweeting, "Big protest in D.C. on
January 6th . . . Be there, will be wild!"  *See* Dan Barry and Sheera Frenkel, *'Be There. Will Be
Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at
https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

On the morning of January 6, 2021, attendees gathered at the Ellipse in anticipation of the rally's start.[2]  A number of speakers took to the stage, including some high-profile figures in the Republican Party.  Representative Mo Brooks (R-Ala.) urged "American patriots" to "start taking down names and kicking ass."[3]  Katrina Pierson, President Trump's spokesperson during his 2016 campaign, stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or we will go after them."[4]  Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and "punch back from Donald Trump."[5]  Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees to march on the Capitol to "stand up for this country and stand up for what's right."[6]  Donald Trump, Jr. narrated that "You have an opportunity today: You can be a hero, or you can be a zero. And the choice is yours but we are

---

[2]     Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[3]     *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

[4]     *Id*.

[5]     *Id*.

[6]     *Id*.

all watching."[7]  Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "trial by combat."[8]

Finally, around noon, President Trump took to the stage.  For an hour, he bemoaned the election results, imploring attendees to "fight" for him:

> We will not let them silence your voices. . . we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen. . . And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. And we're going to the Capitol, and we're going to try and give.[9]

At approximately 12:30 p.m., even before President Trump concluded his speech, some of the rally attendees migrated from the Ellipse toward the Capitol.[10]  At approximately 12:50 p.m., those same attendees breached the outer barricades of the U.S. Capitol grounds.[11]  The U.S. Capitol Police officers, who had been stationed behind the barricades, retreated and called for backup from the Metropolitan Police Department (MPD) and National Guard.[12]  The MPD

---

[7]     *Id.*

[8]     *Id.*

[9]     *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[10]     *See* Dmitiy Khavin, et al., *Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol*, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html; *see also* Shelly Tan, et al., *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

[11]     *Id.*

[12]     *Id.*

arrived approximately 15 minutes later, mobilizing and moving from the South of the building to the West.  But the National Guard did not respond for nearly four hours, during which time clashes between the first wave of protestors and police intensified.[13]

When President Trump concluded his remarks around 1:00 p.m., a second wave of protestors left the Ellipse and headed toward the Capitol.  By the time they arrived, the outer barriers and fencing that had previously surrounded the Capitol building and grounds were largely displaced, giving them free access to join the first wave of protestors on the steps of the building.  Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol itself was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building.  This breach spurred the evacuation of members of Congress and the Vice President, who at the time, were debating congressional challenges to the Electoral College results.[14]

Shortly after the building's breach by others, Mr. Marquez entered the Capitol.  While inside, he filmed the unlawful occupants, as well as U.S. Capitol Police Officers standing in a defensive line.  Mr. Marquez walked approximately 10 feet down a nearby hallway and entered an office, that unbeknownst to him, was the private office of Senator Merkley.[15] Others already occupied the room.  He collected himself for approximately five minutes, then left the office to use the restroom, finding one in the Crypt approximately 20 feet away.  While using the restroom, officers entered and ordered Mr. Marquez to leave.  He complied and officers escorted

---

[13]     *Id*.

[14]     *Id*.

[15]     Importantly, there was no sign denoting it was the senator's, as it was considered Merkley's "hideaway" office.

him from the Crypt to the outside of the building.  Mr. Marquez then returned to his car parked in a nearby garage, and drove home to Florida.

On January 15, 2021, a criminal complaint was filed in U.S. District Court for the District of Columbia charging Mr. Marquez with misdemeanor offenses.  *See* ECF No. 1.  On January 19, 2021, FBI agents arrested Mr. Marquez.  *See* ECF No. 5.  On February 3, 2021, Mr. Marquez had his initial appearance in the U.S. District Court for the District of Columbia, and was released on his personal recognizance with conditions.  *See* ECF No. 8.  On February 19, 2021, a federal grand jury in the District of Columbia returned an indictment against Mr. Marquez alleging: (i) Obstructing an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and Aiding and Abetting the same, in violation of  18 U.S.C. § 2; (ii) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (iii) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (iv) Entering and Remaining in Certain Rooms of the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C); and (v) Disorderly and Disruptive Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D).  *See* ECF No. 9.  On March 3, 2021, Mr. Marquez was arraigned on the indictment.  *See* Minute Entry.   On September 10, 2021, this Court reviewed and accepted Mr. Marquez's guilty plea to count three of the indictment, to wit, Disorderly and Disruptive Conduct in a Restricted Building.

As part of Mr. Marquez's plea, the parties agree that under the 2018 U.S. Sentencing Commission, Federal Sentencing Guidelines Manual (the "Guidelines"), his base offense level, after all adjustments is 4.  *See* ECF No. 21 at 2-3.  The parties further agree that his criminal history score is zero, placing Mr. Marquez in criminal history category I, and suggesting a Guidelines range of 0 to 6 months of incarceration.  *Id*.  The Court set Mr. Marquez's sentencing

for December 10, 2021, and referred him to the U.S. Probation Office for a Presentence

Investigation.  *See* ECF Nos. 23.  The U.S. Probation Office completed its investigation and after

considering all the facts of his case, it recommended that the Court impose no incarceration for

Mr. Marquez, but instead impose 18 months of probation and a $500 fine.  *See* ECF Nos. 26 &

27.

## LEGAL PRINCIPLES

Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. §

1752(a)(2), is a class A misdemeanor.  Because it carries a maximum incarceration period of one

year or less, the United States Sentencing Guidelines (the "Guidelines") are applicable.  *See* 18

U.S.C. § 3559(a)(6); U.S.S.G. §1B1.9 (exempting class B and C misdemeanors from the

Guidelines).  Further, the Guidelines dictate that incarceration for a class A misdemeanor is not

mandatory, and under U.S.S.G. §5B1.1(a)(1) the Court may instead impose a period of

probation.  However, if the Court does choose to impose incarceration, it may also impose up to

a year of supervised release to follow.  *See* U.S.S.G. §5D1.1(b) and 18 U.S.C. § 3583(a) &

(b)(3).

To determine if incarceration is warranted in a particular case, the Court is directed to

consider the factors enumerated in 18 U.S.C. § 3553(a), and "impose a sentence sufficient, but

not greater than necessary, to comply with the purposes of [sentencing]."  Such factors include

the "nature and circumstances of the offense and the history and characteristics of the defendant

and the need for the sentence imposed."  18 U.S.C. § 3553(a).  To determine the "need" for the

sentence, the Court should consider if and how a term of incarceration would "reflect the

seriousness of the offense, promote respect for the law, and provide just punishment for the

offense."  *Id.*  at 2(A).  Additionally, the Court should consider how a sentence would "afford

adequate deterrence to criminal conduct," "protect the public from further crimes of the

defendant," and "provide the defendant with needed educational or vocational training, medical

care, or other correctional treatment in the most effective manner." *Id*. at 2(B-D).  Further, the

Court must be mindful of "the kinds of sentences available," the Guidelines and policy

statements issued by the Sentencing Commission, including the Guidelines range, and "the need

to avoid unwarranted sentencing disparities among defendants with similar records who have

been found guilty of similar conduct." *Id*. at (3), (4) and (6).

### ARGUMENT

Mr. Marquez, a 26-year-old man with no criminal history, but with a ███████████

█████, is worthy of a probationary sentence in this case.  While the nature and circumstances of

the January 6 events were indeed serious, his particular actions that day, paired with his

individual history and characteristics do not lend itself to a sentence of incarceration.  Rather, a

sentence of probation with mental health treatment and restitution, would more adequately meet

the purposes of sentencing under 18 U.S.C. § 3553(a) and would be consistent with his

Guidelines range.  Further, a probationary sentence would provide adequate deterrence to Mr.

Marquez, avoid unwarranted sentencing disparities among other January 6 defendants convicted

of similar conduct, and provide Mr. Marquez with the desperately needed treatment services to

prevent him from re-offending.

### I.   Nature and Circumstances of Mr. Marquez's Offense

The events of January 6 cannot, and should not, be minimized.  When protestors

unlawfully assembled on the grounds of the U.S. Capitol Building, and later broke through

windows and doors, over 100 law-enforcement officers were injured and the U.S. Capitol

Building sustained $1.4 million in property damage.  Five individuals lost their lives.[16]  And

because of the breach, the 2020 Presidential Electoral College count was delayed.  All of these

casualties and disruptions exacted a toll on Americans: some lost family members, some lost

friends, and some lost confidence in the American political system's ability to defend against

threats to the peaceful transfer of power.

Recently, during a sentencing of another January 6 non-violent defendant, the Honorable

Mehta commented,

> There is some mitigation here.  [The Defendant] didn't plan this episode, he didn't
> purposely come to Washington, D.C., to storm the Capitol. The fact remains that he and
> others were called to Washington, D.C., by an elected official, told to walk to the Capitol
> by an elected official. . . People [] were told lies, falsehoods, told the election was stolen
> when it really wasn't. . . I think you are a pawn . . . You are a pawn in a game that's
> played and directed by people who should know better.[17]

Similarly, Mr. Marquez, also fed lies and disingenuous directions by people that should have

known better, is also deserving of mitigation.  He was not the cause of January 6, nor was he in

the classification of people that caused physical harm to the Capitol or others.  He entered the

building, but his unlawful entrance cannot, and should not, be conflated with the many other,

wider, failures that occurred that day.[18]  The former president, the rally's organizers and

---

[16]     Ashli Babbitt was killed after she refused to comply with police commands.  Kevin
Greeson and Benjamin Philips died of unrelated, but perhaps exacerbated, medical conditions
while in the crowd.  Rosanne Boyland was crushed to death.  Officer Brian Sicknick died the day
after, from injuries that appear related to his service on January 6.  *See* Jack Healy, *These Are the
5 People Who Died in the Capitol Riot*, The New York Times (Jan. 11, 2021), available at
https://www.nytimes.com/2021/01/11/us/who-died-in-capitol-building-attack.html.

[17]     *See* Steve Benen, *Judge blames Jan. 6 on Trump, tells rioter he was 'a pawn'*, MSNBC
(Nov. 22, 2021), available at https://www.msnbc.com/rachel-maddow-show/judge-blames-jan-6-
trump-tells-rioter-he-was-pawn-n1284327.

[18]     There are a variety of factors that led to the Capitol being breached, including "paralysis"
"exacerbated by the patchwork nature of security across a city where responsibilities are split
between local and federal authorities" and "driven by unique breakdowns inside each law
enforcement agency."  *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed,*

speakers, and other nefarious, organized groups contributed to the chaos of that day, and are arguably, though not charged, greatly more culpable for what happened on January 6.

Turning to Mr. Marquez specifically, he, on January 5, drove from his home in Florida to attend the rally.  However, it is clear that as he drove, he had a radical misunderstanding of the rally's aim, believing his attendance at the politically conservative event would lend visibility to his causes of ending prostitution and human trafficking.  While driving, Mr. Marquez documented other vehicles on the road that carried Trump flags, feeling a sense of kinship with the other travelers.  Then, in the early morning hours of January 6, Mr. Marquez located a charging station for his vehicle and, lacking the money to pay for a hotel room, curled up in his driver's seat to sleep.  When he awoke later that morning, he drove into D.C., parked his car, and walked down to the Ellipse, preparing to be embraced at a rally with like-minded individuals.

Mr. Marquez, continuing to be confused about the ultimate aim of the rally, stood with thousands of others listening to the presenters.  After hearing the president's speech and heeding his call for supporters to "walk down Pennsylvania Avenue," Mr. Marquez marched with the second wave of protestors toward the Capitol building, believing that President Trump was also in the crowd.  By the time Mr. Marquez arrived at the Capitol, many of the outer barricades and bicycle racks used by officers to cordon off the Capitol grounds were displaced.  Personally, he met no police resistance as he marched, though this is likely because by the time he arrived at the building, officers, having already scuffled with the earlier wave of protestors, had retreated to the inside of the building.

---

The Washington Post (Oct. 31, 2021), available at https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

At approximately 2:49 p.m., Mr. Marquez walked through the already-breached Senate Wing Doors.  Once inside, he collected himself and recorded videos of the resulting scene. Dozens, if not a hundred other protestors were already inside, loudly chanting, "USA! USA! USA!" and other rhetoric mismatched with their conduct.  Mr. Marquez, seeing nearby U.S. Capitol Police Officers, approached them and asked, along with others, "for a fist bump."  The officers, unsure of what to do in the face of so many unruly individuals, attempted to disengage with the crowd, ignoring Mr. Marquez's and others' attempts to make friendly contact.  Mr. Marquez, completely unaware of the gravity of the situation, and believing the officers to be supportive, cried in excitement, "Yeah! We got a fist bump!", when one of the officers finally relented and returned a fist bump of another man.

Following that interaction, Mr. Marquez continued to document other protestors and officers as he made his way down a nearby hallway.  The hallway contained a room, which unbeknownst to Mr. Marquez, was the private "hideaway" office of Senator Jeff Merkely.  Mr. Marquez, seeing others already inside, entered the room and sat down at the conference table, continuing to document the unfolding chaos.  Dozens of protestors were present in the room and some, but importantly not Mr. Marquez, were smoking marijuana and engaging in destructive behavior.[19]

After about five minutes, Mr. Marquez excused himself from the room and walked down a hallway hoping to locate a restroom.  The Crypt, just steps outside the office, caused Mr. Marquez to once again take out his phone to record.  He documented the other individuals trolling the opulent room as he continued to look for a restroom.  His video caught a man yelling

---

[19]     Mr. Marquez did take a few drags of nicotine from a vaporized pen, but he did not participate in the smoking of marijuana or destruction of property.

into a bullhorn, "This is a peaceful protest. We will not destroy one item.  We will not harm one person. We're not burning anything."  In response to that man's disingenuous proclamations, Mr. Marquez yelled out, "We only broke a couple windows."  He then located the Crypt's restroom and proceeded inside.

Once inside the restroom, Mr. Marquez attempted to avail himself of the facilities but eventually,[20] an officer walked in and asked if he was part of the protestors.  Mr. Marquez stated he was, and the officer promptly told him to leave.  Mr. Marquez complied.  Officers escorted him to another group of officers and Mr. Marquez was told to leave through a nearby exit.  Mr. Marquez left, went straight to his parked car, and started home to Florida, once again sleeping in his car at a charging station along the way.

To be clear, Mr. Marquez played no role in organizing the January 6 rally, nor did he deliver inciting and aggressive commentary to the already energized crowd.  He urged no one to "kick[] ass," "go after [politicians]", "punch back from Donald Trump" or engage in "trial by combat."  Additionally, Mr. Marquez did not participate in the forceful breaching of the outer barricades, nor did he participate in the breaching of the inner doors or windows of the U.S. Capitol.  He did not damage or steal any property while inside, and in fact, documented others doing so.  He, at no time, assaulted or threatened law enforcement.  In fact, it was not until days after the event that Mr. Marquez realized officers were unsupportive of the crowd's actions.[21] And perhaps most importantly, Mr. Marquez was decidedly unaware that the aim of President

---

[20] █████████████████████████████████████████████████████████
████████████████

[21]     For more context on why Mr. Marquez was delayed in realizing this, the Court is directed to see the section below discussing his history and characteristics.

Trump's rally and subsequent march to the Capitol had anything to do with overturning the election's results.

Tellingly, when Mr. Marquez was later interviewed by the FBI, he explained that he felt motivated to attend the rally in D.C. because as the child of Cuban parents, he believed communism was a growing threat that needed to be guarded against.  As proof of the threat, Mr. Marquez explained that YouTube had recently threatened to censure his videos against human trafficking.  He also shared that before the rally, he had learned about a document called the "Communist Rules for Revolution", which made him fearful communism was infiltrating the United States Government.[22]  Mr. Marquez summarized that he went to the rally to "protest communism and protest prostitution, which communism promotes."  In other words, Mr. Marquez went to the January 6 rally with a confusing and completely different aim than most every other participant there.  However, what is clear is that he did not attend the rally nor go into the Capitol Building with any intent to stop the electoral certification.

Though misguided in his motivations, Mr. Marquez never tried to hide that he attended the rally and entered the Capitol.  He was completely cooperative and fully open with law enforcement.  When FBI agents arrested him, he consented to a search of his cell phone, vehicle, and a flash drive he had on his person.  He also voluntarily waived his *Miranda* rights and spoke to agents without reservation.  He immediately took responsibility for his actions, and he more

---

[22]     This notably fraudulent document first surfaced in the United States in 1946 and has shown up from time to time in ultra-conservative publications, purporting to be an authentic copy of a document taken from communist officers by allied officers in May, 1919, in Dusseldorf, Germany.  In sum and substance, "the 'rules'" call for "corrupting the young by stressing sex to the exclusion of moral virtues, fomenting disorder and dissatisfaction with government, legislating gun control and seizing power."  *See* Donald Janson*, Communist 'Rules' For Revolt Viewed As Durable Fraud*, The New York Times (Jul. 10. 1970), available at https://www.nytimes.com/1970/07/10/archives/communist-rules-for-revolt-viewed-as-durable-fraud-rules-for.html.

importantly, after seeing the subsequent news coverage, expressed remorse and horror at the day's events.[23]  He now understands that the rally was about overturning the results of the election and is genuinely ashamed he participated in such an event.

In sum, Mr. Marquez's offense conduct that day consisted of him unlawfully assembling at the U.S. Capitol, walking through an already breached door, delusively asking an officer for a "fist bump", documenting other unlawful protestors in the building, sitting in an office, walking into the Crypt to find a restroom, and leaving once asked.  His offense conduct, and not the offense conduct of others in and around the Capitol that day, should inform this Court's sentencing determination.  And the fact that Mr. Marquez did not even seem to comprehend what the actual aim of the rally was, should afford this Court an additional basis to find him less culpable than others.

## II.    <u>Mr. Marquez's History and Characteristics</u>

Born in 1995, Mr. Marquez comes before this Court as a 26-year-old man with no prior criminal history, ███████████████████████████████████.[24]  His parents, immigrants of Cuba, did their best to raise Mr. Marquez in a loving and supportive home, emblematic of the American dream.  However, Mr. Marquez's ███████████████████ after he left his parents' homes, making detection and treatment difficult.

---

[23]      It is true that his remorse was not immediate.  However, his remorse and contrition was expressed to undersigned profusely and often over the life of this case.  Had government counsel requested more information about Mr. Marquez's regret in participating, undersigned would have readily supplied it.  Additionally, when the U.S. Probation Office conducted its investigative interview, Mr. Marquez was not asked if he was sorry for his actions, but instead, was asked if he agreed with the proffer of facts submitted as part of his guilty plea.  Mr. Marquez replied that he did.  Ascribing Mr. Marquez's no further elaboration on that point as somehow indicative of a lack of contrition, is simply inaccurate.

[24]      ████████████████████████████████████████████████

When Mr. Marquez was seven-years-old, two events happened that may have

exacerbated ███████████████████████ ████████████████████████████

████████████ and his parents, unrelatedly, divorced.  These two events gave rise to a feeling of

insecurity for Mr. Marquez, both emotionally and physically.  Adding to this sense of instability,

immediately following the divorce, Mr. Marquez's mother moved him frequently for financial

reasons, and at times, he and his mother slept in her car.  When Mr. Marquez entered high

school, he began living with his father which stabilized him.  When he graduated in 2014, Mr.

Marquez enrolled at Florida Atlantic University (FAU), an immense source of pride for his

immigrant parents.  However, it was during his freshman year of college that ███████████

███████████████████.

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████

███████████████████████████████████████████

█████████████████████████





Mr. Marquez did not return to FAU.

From 2015 to 2017, Mr. Marquez worked odd jobs, including as a CVS pharmacy technician. Then in 2017, Hurricane Irma, the third strongest Atlantic hurricane on record, decimated Southern Florida. In anticipation of its landfall, Mr. Marquez left the Sunshine State and traveled to Tennessee and Colorado, working as a ride-share driver for Uber and Lyft. During this time, Mr. Marquez lived in a rented vehicle. However, in February of 2019, Mr. Marquez, while on his way to pick up a passenger, was struck by another car going 92 miles per hour. The impact caused him to lose consciousness and his seatbelt (which likely saved his life),

---

30      *Id.*

31      *Id.* at 20-27.

32      *Id.* at 42.

33      *Id.*

tore through his abdomen. ███████████████████████████████████
████████████████████████████ Eventually his care and rehabilitation was
transferred to Florida so he could be closer to his family.

As a result of that accident, Mr. Marquez received a monetary settlement from the at-fault
driver's insurance company.  However, with little guidance on how to properly manage that sum
of money, Mr. Marquez bought a house outright, as well as a Tesla.  Showing his immaturity and
inability to plan ahead, Mr. Marquez never considered, and continues to struggle, with how to
pay for his car's charging, his utilities, and homeowner's and car insurance.  To support his
ability to take educational classes online without employment, ███████████████████
██████████████████ to subsidize his living expenses, making his assets appear
inflated.  In reality, Mr. Marquez is on a fixed income, ██████████████████████
████████████████████████████.  He has a reported income of ██████████
█████, income certainly not supportive of a punitive fine.

In 2020, again showing his vulnerability, Mr. Marquez met an individual online that
defrauded him of money under the guise of a romantic relationship.  Following the three-week
"relationship", and unable to come to terms with its nature and termination, Mr. Marquez began
to hypothesize, that his ex, whom he believed he would marry, was a victim of human
trafficking.  To that end, Mr. Marquez began to look up online postings and resources for those
affected by human trafficking.  His online investigation eventually led him make the tangential
connection between conservative politics and anti-prostitution.  It was in this state of
investigation, political discovery, ██████████████████, that Mr. Marquez began to believe that
Donald Trump stood as the ultimate defender of the family unit and the foremost protector
against human trafficking.  When then-president Trump asked his supporters to come to D.C. on

January 6, Mr. Marquez obliged.[34]  However, since January 6, he now understands just how much his goal deviated from others at the rally.

Mr. Marquez feels ashamed, saddened, and has deep remorse for his participation.  In sum, his embarrassment and contrition for being associated with the event, ███████████ ███████████, should allow this Court to find that a probationary sentence is the appropriate resolution in this case.

### III.    The Need to Afford Adequate Deterrence to Criminal Conduct

A sentence of probation would adequately serve as both a specific and general deterrence from additional criminal conduct, in accordance with 18 U.S.C § 3553(a)(2)(B).

Those thinking of participating in another subversive event like January 6, now understand they will come away from that participation with a criminal record, a humiliating arrest process, and be forever lumped into the "mob" behavior featured on the daily news.  As for Mr. Marquez, his arrest and participation in the court process itself has been enough to deter him from ever committing another unlawful act.

For almost a year now, Mr. Marquez has been punished for his actions on January 6.  He lives in abject terror about the prospect of going to prison.  He voraciously reads online postings about how to keep himself safe while in prison and frequently relays his fears of being beaten or raped.  Additionally, following January 6, the State of Florida limited Mr. Marquez's Second Amendment rights, revoking his concealed carry permit.[35]  Additionally, though the government

---

[34] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[35]    *See* ABC7 Staff, *State suspending more concealed gun licenses of Jan. 6 Capitol riot suspects*, ABC& News (Oct. 19, 2021) available at

appears to attribute a nefarious motive to Mr. Marquez, he complied with the Court's September order and dispossessed himself of all firearms.[36]  Moreover, the Federal Aviation Administration also revoked Mr. Marquez's airman certificates.[37]  Further, his participation and conviction for January 6 will also limit future employment opportunities, as his dream of conducting cyber-security for the FBI, is surely dashed.  Simply put, Mr. Marquez, with the addition of supervised probation and restitution will have been sufficiently deterred from ever again participating in any political rally, much less one in D.C., and even lesser still, one at the U.S. Capitol Building.

## IV.   A Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Additionally, sentencing Mr. Marquez to probation would not contribute to an unwarranted sentencing disparity, consistent with the directive enumerated under 18 U.S.C. § 3553(a)(6).  However, sentencing him to anything other than probation, may.

Though many of the January 6 cases remain unresolved, the Court can look to other sentencing judgments to gain a baseline on sentencings.  To date, undersigned is not aware of any other January 6 defendant sentenced for a violation of 18 U.S.C. § 1752(a)(2).  However, there has been a January 6 defendant sentenced on its sister charge, 18 U.S.C. § 1752(a)(1).  In

---

https://www.mysuncoast.com/2021/10/19/state-suspending-more-concealed-gun-licenses-jan-6-capitol-riot-suspects/.

[36]    The government comes to the incorrect conclusion that because his firearms were sold to Mr. Marquez's roommate, he did so as an "end-run around" to what the government and Court were requesting.  However, counsel understands that Mr. Marquez, his roommate, and his roommate's attorney, closely consulted with the U.S. Probation Office who approved of the dispossession in this manner.  Likely, this is because Mr. Marquez does not have access to his roommate's living quarters.

[37]    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See also TSA investigating 'hundreds of names' linked to Capitol riots for possible inclusion on no-fly list*, Associated Press (Jan. 19, 2021), available at https://www.usatoday.com/story/travel/airline-news/2021/01/19/tsa-hundreds-being-considered-no-fly-list-after-capitol-riots/4210079001/.

that case, the defendant, with the *same* criminal history as Mr. Marquez, received a probationary

sentence.  *See United States v. Cordon*, Crim. No. 21-cr-00277 (sentenced to 12 months'

probation).

Additionally, many other January 6 misdemeanor cases have settled with a plea to 40

U.S.C. § 5104(e)(2)(G), a statute that has remarkably similar offense conduct to Mr. Marquez's.

Many sentenced under that provision for January 6, have received probationary sentences.  *See*

*United States v. Anna Morgan-Lloyd*, Crim. No. 21-cr-00164 (sentenced to 36 months'

probation); *United States v. Valerie Ehrke*, Crim. No. 21-cr-00097 (36 months' probation);

*United States v. Danielle Doyle*, Crim. No. 21-cr-00324 (2 months' probation); *United States v.*

*Eliel Rosa*, Crim. No. 21-cr-00068 (12 months' probation); *United States v. Vinson, et al.*, Crim.

No. 21-cr-0355 (5 years' probation); *United States v. Fitchett, et. al.*, Crim. No. 21-cr-00041.

Finally, irrespective of what the government has requested, in the majority of January 6

misdemeanor cases, defendants did not receive active incarceration.  *See* ECF No. 28-1.

The most aggravating facts of Mr. Marquez's case, according to the government, appear

to be the "jovial" way Mr. Marquez participated in January 6, and that he entered the "hideaway"

office of Senator Merkely.  However, considering his ████████████████████████

████████████████████████████, and that he had no idea the office he was entering was

the private office of Senator Merkely, these distinctions appear capricious as best.  Considering

this along with all the other sentencing factors of 18 U.S.C. § 3553(a), including Mr. Marquez's

████████████████████████, there is simply no reason for this Court to depart upward from

other January 6 misdemeanor cases where probation, without active incarceration, was imposed.

**V.** 





40

██████ █  ██████████████████████████████

███████████████████████████████████████

██████████████████████████

**Conclusion**

January 6, 2021 was a horrifying day for many who watched it unfold, whether on television or in-person.  But Mr. Marquez, despite his presence within the crowd, was not a malicious actor who engaged in the outrageous conduct for which the day will be remembered. He did not organize or incite the riot, nor did he physically harm any person or property.  And though Mr. Marquez certainly deserves some punishment for his conduct, it must be weighed against his lack of criminal history, his other history and characteristics, his individual actions on January 6, the non-incarceration sentences imposed on those who engaged in similar conduct, and his ability to receive treatment.  Considering these and other § 3553(a) sentencing factors, a probationary sentence with court-mandated mental health and restitution in the amount of $500 is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
CARA HALVERSON
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Cara_halverson@fd.org

---

[43]   Additionally, given the information available through U.S. Probation's Presentence Investigation Report, the Court may also want to consider ordering substance abuse evaluation and treatment, though Mr. Marquez contends he does not have any issues abstaining from illicit substances.